**In re COUNTRYWIDE FINANCIAL CORP. MORTGAGE–BACKED SECURITIES LITIGATION.**

**Federal Deposit Insurance Corporation as Receiver for United Western Bank, Plaintiff,**

v.

**Countrywide Financial Corporation, et al., Defendants.**

MDL No. 11–ML–2265–MRP (MANx).

Case No. 11–CV–10400–MRP (MANx).

United States District Court, C.D. California, Western Division.

Signed Dec. 9, 2014.

Brian Charles Devine, Inez H. Friedman-Boyce, Goodwin Procter LLP, Boston, MA, Brian E. Pastuszenski, Goodwin Procter LLP, Joel H. Bernstein, Labaton Sucharow LLP, New York, NY, Christopher A. Killens, McGuireWoods LLP, David Martin Halbreich, Reed Smith LLP, Los Angeles, CA, David M. Wilk, Larson King LLP, St. Paul, MN, for In re Countrywide Financial Corp. Mortgage–Backed Securities Litigation.

David J. Grais, Kathryn E. Matthews, Mark B. Holton, Vickie Reznik, Grais and Ellsworth LLP, New York, NY, David S. McLeod, McLeod & Witham LLP, Los Angeles, CA, for Plaintiff.

Michelle K. Camp, Dean J. Kitchens, Michelle K. Camp, Gibson Dunn and Crutcher LLP, Irvine, CA, Alexander K. Mircheff, Christopher Anthony Nowlin, Jeremy W. Stamelman, Gibson Dunn and Crutcher LLP, Los Angeles, CA, for Defendants.

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

MARIANA R. PFAELZER, District Judge.

### I. INTRODUCTION

Defendant UBS Securities LLC ("UBS") underwrote residential mortgage-

backed securities ("RMBS") that United Western Bank ("the Bank") purchased.[1] The Bank subsequently failed and the Federal Deposit Insurance Corporation ("FDIC") was appointed as receiver. The FDIC filed suit against Defendant on August 23, 2010. The FDIC has alleged that the "Offering Documents" used to create and market certain RMBS purchased by the Bank contained material misstatements about Loan–to–Value ("LTV") ratios, appraisals, and other aspects of the mortgage loans that backed the securities. As a result of those misrepresentations, the RMBS were allegedly far riskier than stated in the Offering Documents. Following motion practice, the sole claim that remains against the Defendant is under Section 11–51–501(1)(b) of the Colorado Securities Act ("CSA").

UBS now moves for Summary Judgment on four grounds: (1) that the FDIC's claim is time-barred under the CSA's three year statute of limitations because the Bank knew or should have known that "something was amiss" by April 2007; (2) that the Bank had knowledge of alleged misstatements or omissions at the time it purchased the Certificate; (3) that the relevant section of the CSA includes an affirmative defense of lack of loss causation and UBS has demonstrated a lack of loss causation as a matter of law; and (4) that there is no evidence of actionable misstatements concerning appraisals or LTV's. This Court finds these arguments unpersuasive and UBS's motion is **DENIED.**

## II. LEGAL STANDARD

Summary judgment should be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party

bears the burden to establish that there are no genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *accord Castillo v. County of L.A.,* 959 F.Supp.2d 1255, 1258 (C.D.Cal.2013). A court deciding a summary judgment motion must view the facts, and draw all reasonable inferences therefrom, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. DISCUSSION

### A. The FDIC's Claims are Not Time–Barred

UBS argues that the FDIC's action is time-barred. To determine if the FDIC's claims are time-barred under the CSA, this Court must first examine the level of knowledge sufficient to trigger the CSA's three-year limitations period. Then, this Court must evaluate if the Bank had such knowledge as a matter of law more than three years before filing suit.

### 1. The CSA uses a Discovery Trigger

■ The parties dispute the appropriate trigger for the CSA's statute of limitations. UBS argues that the CSA provides for an inquiry notice trigger, while the FDIC contends that a discovery trigger is proper. The FDIC has the far stronger argument, as the text of the statute and relevant case law point to the use of a discovery trigger.

On its face, the CSA uses a discovery trigger. The relevant section of the CSA cautions that "[n]o person may sue under ... this section more than three years after the discovery of the facts giving rise

---

**1.** The Certificate at issue is CWALT 2005–43, 1–A–2. The Bank purchased this Certificate on October 31, 2005.

to a cause of action ... or after such discovery should have been made by the exercise of reasonable diligence." Colo. Rev.Stat. Ann. § 11–51–604(8) (West). Absent case law demonstrating a different application on the part of Colorado courts, this Court is inclined to follow this natural reading of the statute.

Moreover, this discovery-trigger approach accords with Colorado's general limitations-accrual provision, which notes that a claim accrues "when the injury, loss, damage, or conduct giving rise to the cause of action is discovered or should have been discovered by the exercise of reasonable diligence." Colo.Rev.Stat. Ann. § 13–80–108(8) (West). The Colorado Supreme Court has clarified that discovery occurs when the plaintiff "knows, or should know, all material facts essential to show the elements of [the] cause of action." *Melat Pressman & Higbie, LLP v. Hannon Law Firm, LLC,* 287 P.3d 842, 847–48 (Colo.2012) (en banc) (citing *Miller v. Armstrong World Indus., Inc.,* 817 P.2d 111, 113 (Colo.1991) (en banc)).

UBS's arguments against the natural reading of a discovery trigger are unpersuasive. Defendant relies on *Lucas v. Abbott,* 198 Colo. 477, 601 P.2d 1376 (1979), and *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.,* 387 F.Supp.2d 1130 (D.Colo.2005), in support of the argument that the CSA provides for inquiry notice. However, neither case offers UBS's position much aid. In *Lucas,* the court held that "that the claimant's cause of action to establish a constructive trust accrues, for purposes of the statute of limitations, when the claimant is aware, or reasonably should be aware, of facts which would make a reasonable person suspicious of the wrongdoing asserted as the basis of the trust." 198 Colo. at 481, 601 P.2d 1376. Even read broadly, this standard does not quite reach the level of "something was amiss," an inquiry notice trigger. *See Mass. Mut.*

*Life Ins. Co. v. Countrywide Fin. Corp.,* No. 11–CV–10414, 2012 WL 1322884, at *3 (C.D.Cal. Apr. 16, 2012). Under *Lucas,* the suspicion must be of the wrongdoing itself, a standard which comes close to requiring knowledge of the very facts giving rise to the claim. In any event, the Colorado Supreme Court has clarified accrual is not triggered by mere suspicion in cases post-*Lucas. See Melat,* 287 P.3d at 847–48. Similarly, *In re Qwest* did not announce an inquiry-notice trigger. There, the court concluded that the statute of limitations had not run as plaintiff did not and "should not reasonably have discovered the factual basis" for the claims within the applicable period. 387 F.Supp.2d at 1151.

This Court concludes, on the basis of the statute's language and Colorado's overall approach to limitations and accrual, that the CSA uses a discovery trigger.

## 2. Bank Lacked Knowledge of Alleged Wrongdoing as of April 23, 2007

Having held that the CSA uses a discovery trigger, this Court must now determine if UBS has met the relatively high burden of demonstrating that by April 23, 2007 the Bank knew or should have known the material facts of the alleged wrongdoing. On the present record, this Court concludes that UBS has not met its burden.

Defendant largely points to public information to demonstrate the Bank's supposed knowledge of the alleged conduct. *See* Def.'s Motion for Summary Judgment, Exhs. 33–35, A1–A72. The public information at issue here, without something more, falls far below the discovery trigger of the CSA. While articles concerning the looming financial crisis and the housing bubble may help increase awareness of potential risk in a sector, UBS has not shown, on the strength of news reports

alone, that the Bank ought to have *discovered* alleged underwriting violations by April 2007.

UBS's case for the Bank's knowledge of the alleged misstatements can be summarized as follows: (1) media coverage of the "looming financial crisis" and the "housing bubble" increased in 2006; (2) the Bank was "tracking information about the performance and credit characteristics of the loan pools underlying the Certificate at issue" in 2006; (3) the Bank set up a "Securities Portfolio Profile" which allowed for the collection of certain information; (4) the Bank demanded in 2005 that Countrywide repurchase certain loans due to credit issues; and (5) the Bank knew in 2007 that certain Countrywide securities had "collateral performance issues." Examining this patchwork, this Court is struck by the absence of any mention of the actual conduct alleged in the FDIC's complaint. There is no in-depth discussion of LTV ratios or appraisal procedures, much less a discourse on Countrywide-specific practices. On such a record, it is not difficult to conclude that, drawing all reasonable inferences in the favor of the non-moving party, the Defendant has not demonstrated that the Bank knew or should have known of the alleged misstatements.

### B. The Bank Did Not Have Actual Knowledge of the Prospectus' Alleged Untruths and Omissions in 2005

UBS insists that the Bank had actual knowledge of the prospectus' deficiencies at the time it purchased the Certificate. Accordingly, UBS argues that it is excused from liability under C.R.S. § 11–51–604(4), which shields a seller if the buyer knew of the untruth or omission at the time of purchase. This argument is unpersuasive.

UBS argues that the Bank, due to diligence conducted in 2005, knew of Countrywide's failure to follow underwriting guidelines with respect to a set of loans. This diligence concerned a different set of loans than those connected to the Certificate at issue. Further, Defendant does not specify if the deficiencies uncovered in 2005 were the very same issues alleged in the FDIC's complaint (*e.g.,* misreporting LTV's).

Similarly, Defendant argues that the Bank must have had knowledge of the alleged deviation in underwriting standards because it had experience in loan origination and underwriting. Even if this Court were to accept the allegation that the Bank had deviated from underwriting standards, there is no evidence to suggest that the Bank knew these deviations were industrywide.

■ UBS has not shown that the Bank, as a matter of law, knew or reasonably should have known of defects in the prospectus by April 2007. This Court similarly concludes that UBS has not shown that the Bank, as a matter of law, had actual knowledge of the defects in the prospectus at the time of the sale of the Certificate in 2005.

### C. § 11–51–501(1)(b) of the Colorado Securities Act Does Not Include an Affirmative Defense of Lack of Loss Causation

The parties dispute whether the CSA provides for an affirmative defense of lack of loss causation. The Supreme Court of Colorado has not analyzed this section with respect to loss causation. Therefore, this Court must predict how Colorado's highest court would rule if faced with such a question. *Orkin v. Taylor,* 487 F.3d 734, 741 (9th Cir.2007).

The text of the CSA has no mention of a loss causation element or defense. Section 11–51–501(1)(b) states that "[i]t is unlawful for any person, in connection with the of-

fer, sale, or purchase of any security, directly or indirectly ... [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." Section 11–51–604(4) further clarifies that "[a]ny person who sells a security in violation of section 11–51–501(1)(b) (the buyer not knowing of the untruth or omission) and who does not sustain the burden of proof that such person did not know, and in the exercise of reasonable care could not have known, of the untruth or omission is liable to the person buying the security from such person." Neither section allows for or even alludes to a loss causation defense. In light of this fact, this Court must start from the assumption that the Supreme Court of Colorado would likely hold that no such defense exists under the CSA. *Rosenthal v. Dean Witter Reynolds, Inc.*, 908 P.2d 1095, 1100 (Colo.1995) (en banc) (noting that the court looks first to "plain language of the controlling statutes").

■ UBS argues that an affirmative loss causation defense exists under the CSA for two reasons: 1) the analogous federal securities law now provides for such a defense after a 1995 amendment; and 2) the defense was always provided at common law and is thus implicit in the CSA. Neither argument is convincing. This Court notes that it has passed on essentially identical arguments regarding Alabama's blue sky law, which similarly lacks any mention of loss causation and is modeled on federal securities law. As such, the analysis below is largely duplicative of this Court's denial of summary judgment in *FDIC as Receiver for Colonial Bank v. Countrywide Securities Corp.*, 12–CV–8317–MRP (MANx).

Colorado courts look to analogous federal securities law in resolving ambiguities in their blue sky law. *See, e.g., In re Stat–Tech Sec. Litig.*, 905 F.Supp. 1416, 1423 n. 4 (D.Colo.1995). The instant section of the CSA tracks the language of Section 12(2) of the Securities Act of 1933 ("the Act"),[2] which did not provide for the affirmative defense of loss causation until subsequent amendment. Although Congress introduced a loss causation defense to the Act when it enacted the Private Securities Litigation Reform Act ("PSLRA") in 1995,[3] Colorado has not adopted a similar amendment to the CSA. It would have not been difficult to mirror language provided in PSLRA. Other state legislatures have done so, suggesting that Colorado legislators knew and approved of the fact that

---

**2.** The Act provides that anyone who "offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable ... to the person purchasing such security from him." 15 U.S.C. § 77*l*(a)(2).

**3.** "Loss causation—In an action described in subsection (a)(2) of this section, if the person who offered or sold such security proves that any portion or all of the amount recoverable under subsection (a)(2) of this section represents other than the depreciation in value of the subject security resulting from such part of the prospectus or oral communication, with respect to which the liability of that person is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statement not misleading, then such portion or amount, as the case may be, shall not be recoverable." 15 U.S.C. § 77*l*(b).

**1042**

the CSA did not provide for loss causation. *See, e.g.*, Ariz.Rev.Stat. § 44–1991(B).

UBS attempts to overcome this first by suggesting that the 1933 Act *always* provided for an implicit loss causation defense, and that Congress' subsequent amendment sixty years later amounted only to a "clarification" reflecting that fact. This Court need not attempt to divine the original intent of a legislative session that took place eighty years ago. UBS's opening brief conspicuously ignores *Randall v. Loftsgaarden*, 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986). In *Randall*, the Supreme Court noted that the Act did not allow for a loss causation defense, finding "by enabling the victims of prospectus fraud to demand rescission upon tender of the security, Congress shifted the risk of an intervening decline in the value of the security to defendants, *whether or not that decline was actually caused by the fraud.*" *Id.* at 659, 106 S.Ct. 3143 (emphasis added). The Court further noted that this arrangement "adds an additional measure of deterrence as compared to a purely compensatory measure of damages." *Id.; see also Nat'l Credit Union Admin. Bd. v. Morgan Stanley & Co.*, 13 CIV. 6705 DLC, 2014 WL 1673351, at *4 (S.D.N.Y. Apr. 28, 2014) ("[I]t is well established that, prior to the 1995 amendment of Section 12, loss causation was not an affirmative defense to

a Section 12 claim." (citing *Randall*, 478 U.S. at 659, 106 S.Ct. 3143)). Moreover, the case law shows that prior to the 1995 amendment, several circuit courts had concluded that Section 12(2) of the Act did not contain a loss causation element. *Casella v. Webb*, 883 F.2d 805, 808–09 (9th Cir. 1989); *Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124, 1126 (2d Cir.1989).

There can be little doubt that there was no causation defense in the Act before 1995. Congress' actions to alter the Act, though characterized as a "clarification,"[4] do not change the fact that the judiciary had already determined that the Act, as then written, lacked a loss causation element. It is extremely unlikely that the Supreme Court would deviate from its analysis in the face of information provided by a Congress six-decades removed from the original drafting of the Act. "Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 131 S.Ct. 1068, 1081, 179 L.Ed.2d 1 (2011).[5]

UBS argues that at common law, rescission provided for a loss causation defense and both the Securities Act of 1933 and the CSA did not disturb this defense. This argument is simply not supported by the

---

**4.** Section 12. S.Rep. No. 104–98, at 23 (1995), 1995 U.S.C.C.A.N. 679, 702 ("Some courts have held that a plaintiff suing under Section 12(2) need not prove that the misstatement or omission caused the loss.... The Committee amends Section 12(2) to clarify that defendants may raise the absence of 'loss causation' as an affirmative defense.").

**5.** It is worth noting that other courts have similarly resisted the urge to read in loss causation elements in the face of this "clarification." *See Duperier v. Tex. State Bank*, 28 S.W.3d 740, 753 (Tex.App.2000) (loss causation is not an available defense under Tex. Civ. Stat. art. 581–33(a)(2)); *NCUA*, 2014 WL

1673351, at *11–14 (same under Texas or Illinois law); *Fed. Hous. Fin. Agency v. HSBC N. Am. Holdings, Inc.*, 988 F.Supp.2d 363, 368–69 (S.D.N.Y.2013) (same under Virginia Securities Act or District of Colombia Securities Act); *Premier Capital Mgm't LLC v. Cohen*, No. 02 C 5368, 2008 WL 4378300, at *18 (N.D.Ill. Mar. 24, 2008) (same under Virginia Securities Act); *Lucas v. Downtown Greenville Investors Ltd. P'ship*, 284 Ill.App.3d 37, 219 Ill.Dec. 475, 671 N.E.2d 389, 398–400 (1996) (same under Illinois Securities Act); *Gilliland v. Hergert*, No. 2:05–cv–01059, 2008 WL 2682587, at *7 (W.D.Pa. July 1, 2008) (same under Pennsylvania law).

case law. While causation is an element to a common law claim for deceit, rescission at common law does not require causation.[6] This conclusion is further bolstered by the large number of courts that have found that there is no loss causation element in similar blue sky laws.[7]

As loss causation is not an affirmative defense under the CSA, UBS's motion for summary judgment on the basis of lack of loss causation is DENIED.

### D. The Prospectus' Claims Regarding Procedures Followed in Appraisals May Qualify as Actionable Misstatements

The parties differ as to whether claims in offering documents regarding home appraisals and LTV ratios are actionable misstatements. UBS argues that LTV's are dependent on appraisals, which themselves are mere expressions of opinion. But UBS misrepresents plaintiff's argument—the FDIC correctly notes that while an individual appraisal of value could possibly be considered an opinion, UBS's pledge that specific procedures were followed in generating appraisals and LTV's constitutes an actionable statement of material fact. *See In re Bear Stearns Mortg. Pass–Through Certificates Litig.*, 851 F.Supp.2d 746, 769 (S.D.N.Y.2012) (allegations that appraisals were not conducted in accordance with USPAP were actionable as "a statement of verifiable fact"); *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 843 F.Supp.2d 191, 203 (D.Mass. 2012) ("A representation that certain specific standards will be used to generate appraisals is itself an actionable statement of fact.").

Here, it is clear that UBS made material statements of fact regarding the procedures used to arrive at the relevant LTV's. The prospectus documents note that "appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards," CWALT Alternative Loan Trust 2005–43, Prospectus Supplement at S–75, that is, conducted in line with the Uniform Standards of Professional Appraisal Practice. However, plaintiff has introduced significant evidence that the appraisals at issue fell below that standard in more than half of the loans at issue. *See, e.g.*, Pl.'s Opp. to Def.'s Motion for Summary Judgment, Exh. 23.

As statements concerning appraisal standards are material statements of fact and the FDIC has established a genuine dispute as to the veracity of the statements at issue, UBS's motion for summary judgment for lack of material misstatement is DENIED.

## IV. CONCLUSION

The Court **DENIES** UBS's Motion for Summary Judgment.

IT IS SO ORDERED.

---

**6.** *Rousseff v. E.F. Hutton Co.*, 867 F.2d 1281, 1285 (11th Cir.1989) (per curiam) ("The elements of rescission, in a nutshell, are misrepresentation of a material fact on which the buyer justifiable relied. Loss causation has never been required there.").

**7.** *See supra* note 5.